UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- x

TAJ PATTERSON,

**DOCKET 16-CV-3525 (NGG)(SMG)**

Plaintiff,

-against-

**FIRST AMENDED COMPLAINT
AND JURY DEMAND**

CITY OF NEW YORK, POLICE OFFICER RODRIGO
FERNANDEZ, SERGEANT IVAN FURDA, SERGEANT
ZAIKOWSKI, WILLIAMSBURG SAFETY PATROL,
INC., SHMIRA VOLUNTEER PATROL CORP,
ABRAHAM WINKLER, AHARON HOLLENDER,
MAYER HERSKOVIC, JOSEPH FRIED, PINCHAS
BRAVER, YOELI ITZKOWITZ, JOHN DOE 1-10

Defendants.

----------------------------------------------------------------------- x

Plaintiff Taj Patterson, by his attorneys Andrew B. Stoll and Amy E. Robinson, of

Stoll, Glickman & Bellina, LLP, alleges:

## PRELIMINARY STATEMENT

1.     This is a civil rights action in which Plaintiff seeks relief through 42 U.S.C. §§

1983 and 1985 for violations of his civil rights protected by the Fourth, Thirteenth, and

Fourteenth Amendments, in addition to violations of the laws and Constitution of the

State of New York.

2.     The claims arise from a December 1, 2013 incident in which defendants formed

a conspiracy for the purpose of depriving Plaintiff equal privileges and immunities under

the law, and impeding, hindering, obstructing, or defeating the due course of justice, with

intent to deny Plaintiff the equal protection of the laws.  Defendants also acted under

color of law by falsely arresting plaintiff using excessive force, causing him substantial

1

pain and permanent injuries.

3.      Plaintiff seeks monetary damages (special, compensatory, and punitive) against defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## JURISDICTION

4.      This action arises under the Fourth, Thirteenth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. §§ 1983 and 1985, and the laws and Constitution of the State of New York.

5.      The jurisdiction of this court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 1367(a), and the doctrine of pendent jurisdiction.

## VENUE

6.      Venue is laid within the Eastern District of New York in that Defendant City of New York is located within and a substantial part of the events giving rise to the claim occurred within the boundaries of the Eastern District.

## PARTIES

7.      Plaintiff TAJ PATTERSON is a gay Black gentile man who resided at all times here relevant in Kings County, City and State of New York.

8.      The CITY OF NEW YORK ("the City") is a municipal corporation organized under the laws of the State of New York.  At all times here relevant, the City was responsible for the policy, practice, supervision, implementation, and conduct of all law enforcement matters referenced here, and was responsible for the appointment, training, supervision, discipline, retention, and conduct of all New York City Police Department ("NYPD") personnel, and the organizations to whom they delegated their law enforcement authority as a matter of regular practice.  In addition, at all times here

2

relevant, the City was responsible for enforcing the rules of the NYPD, and for ensuring that NYPD personnel and the organizations to whom they delegated their law enforcement authority as a matter of regular practice, obeyed the laws of the United States and the State of New York.

9.     Defendants POLICE OFFICER RODRIGO FERNANDEZ ("Officer Fernandez"), SERGEANT IVAN FURDA ("Sergeant Furda"), AND SERGEANT ZAIKOWSKI ("Sergeant Zaikowski"), (collectively "the officers") were, at all times here relevant, police officers of the NYPD, and as such were acting in the capacities of agents, servants, and employees of the City of New York.  At all times here relevant, the defendant officers personally participated in the decision not to pursue an investigation into crimes committed against Plaintiff, based solely upon the races, religions and sexual preferences of Plaintiff and other defendants.  The officers are sued in their individual capacities.

10.     Defendants WILLIAMSBURG SAFETY PATROL, INC. and SHMIRA VOLUNTEER PATROL CORP (collectively, "WSP") at all times here relevant were business entities organized and existing under the laws of the State of New York, and licensed to transact business in the State of New York.  WSP comprised two of several neighborhood safety patrols organized and operated by volunteer orthodox Jews in different neighborhoods throughout Brooklyn (collectively, "the Shomrim Groups").

11.     The City substantially has funded and continues to fund the Shomrim groups, including WSP, through over a million dollars in discretionary City Council funding, as well as other New York City and State earmarks, which at times have been allocated to purchase specific law enforcement equipment such as bullet proof vests, police radios for WSP to communicate directly with NYPD precincts, "search and rescue command

3

posts", and vehicles and uniforms that are virtually indistinguishable from NYPD vehicles.

12.    The Shomrim groups, including WSP, often make arrests for and with the NYPD, and enjoy ready access to areas of NYPD precincts not otherwise open to the public.  Shomrim members have readily been allowed access to areas of NYPD precincts not ordinarily open to the public and, conversely, both front line and high ranking NYPD personnel frequently visit Shomrim "command centers" and vehicles in the course of their operations.

13.    When arresting individuals, the Shomrim groups, among them WSP, profess to act pursuant to statutory authority granted under New York Criminal Procedure Law § 140.30, which provides statutory authority for when a person may arrest another person in New York State.

14.    High ranking NYPD officials have regularly appeared at functions sponsored by the Shomrim groups, and vice-versa.

15.    The Shomrim groups' insignia are virtually identical to the NYPD's, and even include the "CPR"- "Courtesy, Professionalism, Respect" insignia often seen on NYPD vehicles.    The Shomrim groups' members frequently also wear official NYPD "Volunteer" badges.

16.    The NYPD not only tolerates, but encourages, solicits, and works jointly with the Shomrim in performing public functions such as apprehension and crowd control.  A high ranking NYPD official from the 66th Precinct literally cut the ribbon at the unveiling of a $300,000.00 "mobile command truck" for one of the Shomrim groups, which was paid for by New York City funds and, like other vehicles of the Shomrim groups, bears insignia that make it indistinguishable from NYPD vehicles.  Another Shomrim Group

4

received a $250,000.00 "mobile security command center" "fully equipped for us to respond to any type of disaster", with "conference room, a fax machine, a flat panel television and a state-of-the-art communications system" paid for with funds allocated by the Brooklyn Borough President and the City Council.

17.    One of the discretionary funding requests submitted by New York City Council Member Brad Lander for one of the Borough Park Shomrim groups, in 2012, requested funds in part for "crowd control at special community events in cooperation with the 66th Precinct, lessening the manpower drain on the precinct."

18.    New York City officials consistently praise the Shomrim groups and reference the traditionally public function played by the Shomrim Groups and their utility to law enforcement.  For example, former State Senator, now Brooklyn Borough President Eric Adams publicly lauded them as "brave men who put themselves in harm's way to protect us from danger"; City Council Member David Greenfield has observed the "important public service" of the Shomrim Groups; New York State Assemblyman Dov Hikind notes "they are out protecting our community, putting themselves at risk on a daily basis";[1] New York City Council Member Steven Levin has noted that "the Williamsburg Shomrim was instrumental in apprehending" suspects; the Commanding Officer of the 66th Precinct, Captain Kenneth Quick, has called the Shomrim a "good force multiplier"; WSP refers to itself as "part of the NYPD Community Affairs Division".

---

[1]    The Assemblyman has also said "Sometimes, if you get very close, you forget the fact that they are the police and we are the shomrim.  There has to be a barrier. Has it sometimes not been healthy? That could very well be."



A Shomrim "Command Post" paid for by the City



Another Shomrim vehicle





A "tweet" from WSP's Twitter feed



**Williamsburg Shomrim @WspuShomrim** Mar 23
Great teamwork **@NYPD90pct** crime team
**@wspushomrim** in apprehending this morning guy
stealing parts from cars.

Another "tweet" from WSP's Twitter feed



WSP in the field



WSP at the scene of a 4 year old struck by a truck.

19.    The NYPD grants the Shomrim Groups, including WSP, special privileges and exemptions from the law, such as use of "police package" emergency lights and vehicles equipped with police scanners, their own liaisons to the NYPD with the personal phone numbers of high ranking members of the NYPD, and countless of other favors and special consideration extended to Shomrim members that are not extended to other members of the community.  Despite being an extension of the NYPD (New York State Assemblyman Dov Hikind calls it a "long marriage"), and engaging in law enforcement for the City of New York, the Shomrim groups receive little or no formal training by the NYPD, and are completely outside the authority of the City of New York.

20.    The Shomrim Groups, including WSP, are willful participants in joint activity with the state, they are controlled by the City Council through its ability to fund them, they are frequently delegated public functions by the City of New York and frequently intervene in law enforcement matters, particularly matters that are solely within the Orthodox Jewish communities,[2] and they are entwined in the management and control of the NYPD.

21.    Defendants  ABRAHAM  WINKLER,  AHARON  HOLLENDER,  MAYER HERSKOVIC, JOSEPH FRIED, PINCHAS BRAVER, YOELI ITZKOWITZ, and JOHN DOE ##1-10 were, at all times here relevant, residents of the County of Kings, City and State of New York, and were members and employees of the Shomrim, or were working on behalf of the Shomrim.

22.    At all times here mentioned defendants were acting under color of the statutes,

---

[2]       One of countless examples was described to the New York Times by Stephen McAllister, who was the commanding officer of the 66th Precinct beginning in 2002, and is currently the Police Commissioner of Floral Park; he describes crimes being committed, apparently in his presence:  "I told the shomrim, 'you go into your own people and shut that down... If the police had waded into that scenario, it could potentially go bad'". Feuer, Alan, Brooklyn's Private Jewish Patrols Wield Power. Some Call Them Bullies, NY Times, 6/17/16.  Another example is referenced in  f.n. 4, below.

ordinances, regulations, policies, customs and usages of the City and State of New York.

## THE ASSAULT OF PLAINTIFF, AND PROSECUTION OF SOME OF THE PERPETRATORS

23.    Plaintiff is a gay African American male who lives in Brooklyn, in a diverse community that contains a large and politically powerful population of Satmar Jews- an "ultra-orthodox" Jewish sect.

24.    The Satmar of Williamsburg have their own neighborhood patrol group- the Williamsburg Safety Patrol, Inc., or Shmira Volunteer Patrol Corp (collectively, "WSP"), which, as described above, virtually replaces the official police in parts of Williamsburg, frequently arresting criminal suspects and holding them for the 90th Precinct of the NYPD, with whom WSP has a uniquely close working relationship.  That relationship includes direct police radio communication between WSP and the 90th Precinct, and is further detailed in the "parties" section above.

25.    Very early in the morning of December 1, 2013, Plaintiff was walking home on the streets of Williamsburg, Brooklyn.  He had committed no offense when Wolf Herskowitz ("Wolf", unrelated to Mayer Herskowitz), a Shomrim enthusiast and hanger-on known colloquially as a "buff" or "buffer", who had previously worked for a Shomrim group in Borough Park, along with Louis Baez ("Baez"), passed him in a car.

26.    Wolf and Baez believed Plaintiff was acting suspiciously, and Wolf claimed later under oath, during a criminal trial of defendant Mayer Herskowitz, that he believed at the time of the incident that Plaintiff was vandalizing cars- a belief he later found to be unsubstantiated.

27.    Wolf and Baez did not call 911 but instead, called the Williamsburg Safety Patrol, to report the suspicious behavior they believed they observed.

10

28.    Within the communities where the Shomrim groups operate, the majority of the orthodox Jewish citizens report law enforcement issues to the Shomrim groups first and usually exclusively, in lieu of the NYPD, which former Police Commissioner Raymond Kelly cites as a "longstanding issue".

29.    After calling the Williamsburg Safety Patrol Wolf and Baez caused Plaintiff to be chased, for the purpose of making an arrest.

30.    The first three people chasing Plaintiff were Baez, defendant Yoeli Itzkowitz, who was speaking into a walkie-talkie and wearing an official looking Shomrim jacket, and another individual, wearing traditional orthodox Jewish garb.

31.    Many other individuals, wearing Shomrim uniforms and traditional orthodox Jewish garb, joined in chasing Plaintiff.

32.    The individuals chasing Plaintiff were presuming and intending to act in the quasi-law enforcement role that the Shomrim groups serve, as described throughout this complaint.

33.    As Plaintiff struggled to escape the WSP members, he was attacked and beaten so severely it left him blind in one eye.  As they were assaulting Plaintiff, defendants were using homophobic slurs.

34.    Witnesses at the scene stopped their vehicles and some intervened in the assault in progress, which ceased once they got involved.  The witnesses called 911, and were able to note the license plate of two of the assailants' cars.

35.    When New York City police officers arrived, among them Officer Fernandez, Sergeant Furda, and Sergeant Zaikowski, they gathered witness names and contact phone numbers.  The witnesses told the officers everything they had seen, including a description of the assailants and their clothing, which consisted of some in official

looking uniforms, and many in traditional orthodox Jewish clothing. They gave the police the license plate they had noted, and other information.

36.   Plaintiff was taken by ambulance to Woodhull hospital, and left alone there.

37.   While Plaintiff was being treated at the hospital, defendants were conspiring to avoid any further investigation of the matter.  Calls to the precinct were made by Shomrim members, and the case was closed out, marked "Final, No Arrests".

38.   Plaintiff's mother ultimately assisted him in getting press coverage of the matter.

39.   After the press got involved, Plaintiff and his mother were contacted by the Hate Crimes Unit of the NYPD- detectives outside of the 90th Precinct.

40.   The Hate Crimes detectives worked the case up with the information they obtained, and were ultimately able to develop probable cause to arrest Winkler, Hollender, Herskovic, Fried, and Braver.

41.   Had the case been properly immediately forwarded to the Detective Squad at the 90th Precinct, however, further suspects would have been identified, and the evidence against the suspects that were identified would have been much stronger.

42.   Instead, evidence quickly disappeared, witnesses were able to prepare to be confronted by questioning, and as the criminal case proceeded, witnesses who were close to the Shomrim, who had identified some of the suspects, began to recant their statements, including their sworn Grand Jury testimony.

43.   Partially as a result, the criminal cases against Aharon Hollender and Joseph Fried were dismissed.

44.   Abraham Winkler and Pinchas Braver each pled guilty to misdemeanor unlawful imprisonment for their roles in the matter.

45.     At the time of the drafting of this complaint, Mayer Herskovic was still heading

for a trial in Kings County Supreme Court.

## THE AFTERMATH AND THE PERPETRATORS' CONNECTIONS TO THE HIGHEST LEVELS OF THE NYPD AND THE DISTRICT ATTORNEY'S OFFICE

46.     Sergeant Furda was directly involved in the initial police response, and the

initial decision to close the case out with no further investigation or arrests.  Ultimately,

disciplinary charges were brought against him and he lost ten days' vacation in a

negotiated disposition of the disciplinary matter.  Such a disposition is a relatively

startlingly severe disposition for what an NYPD spokesman told the New York Daily

News was merely "poor judgment, but we don't believe he had any intention of covering

it up".  Although witnesses described the assailants in detail to the police at the scene of

the incident, including that they appeared in every way to be orthodox Jews based on

their clothing and hairstyles, Sergeant Furda claims he was the first officer to respond,

and further claims that he did not even know the assailants appeared to be Jewish.

47.     Unlike the blowback to Sergeant Furda, Pinchas Braver, one of the admitted

perpetrators of the crimes against Plaintiff, received special treatment and rewards from

the NYPD.  About a year after he was indicted, on May 21, 2015, while his criminal case

was still pending, Braver received a special tour of the NYPD's 19th Precinct station

house, where he was granted access to the "muster room"-an area of the precinct that is

not open to members of the public.[3]

48.     It is particularly relevant that it was the 19th Precinct that Braver visited- a

---

[3]        Braver was not the only one of the defendants to be honored by city officials even while being the subject of a criminal prosecution; Joseph Fried has previously been charged with Criminal Contempt of Court for taking photographs of a sex abuse victim who dared to testify against a powerful member of the Satmar community- who was ultimately convicted and sentenced to 103 years in prison.  While the case was pending against Fried, New York City Council Member Steven Levin, a WSP booster who has steered city funding to WSP, attended his wedding and was photographed with him.  Shortly thereafter, Fried was charged with the assault on Taj Patterson.

Manhattan precinct well removed from Braver's daily routine.  At the time, the Precinct was commanded by Deputy Inspector James Grant, who has recently been arrested and charged in the United States District Court, Southern District of New York, with corruptly bestowing various benefits upon members of the Orthodox Jewish Community. The US Attorney for the Southern District observed that those members of the Orthodox Jewish Community "got, in effect, a police force for themselves and their friends... Effectively, they got cops on call".  Deeply implicated (and indicted) in that matter was a Shomrim leader named Shaya Lichtenstein, who was regularly obtaining gun permits for his "clients", who were other members of the Orthodox community, and many of whom might not have otherwise qualified for approval of the permits they sought.  Lichtenstein parlayed his involvement in the Shomrim into his lucrative career, and ended his career being secretly tape recorded attempting to bribe a police officer he met through his Shomrim ties.  He was close to James Grant, the Commanding Officer of the Precinct where Plaintiff's assailant Pinchas Braver was photographed in the muster room, and paid for work on Grant's house, according to sources named in the federal complaint against Grant.

49.   It is not a coincidence that the case involving Taj Patterson and Pinchas Braver was mysteriously closed out within a day, with no arrests, and that Braver, one of the perpetrators against Taj Patterson, was found in the inner sanctum of a precinct commanded by an officer who was "on call" for members of that community.

50.   It's not just the commanding officer of the 19th Precinct who had surprisingly deep and questionable ties to the Shomrim, however.  The 90th Precinct itself was commanded at the time of Taj Patterson's assault by Mark DiPaolo, who took a trip to Israel former with former NYPD Chief of Department Phillip Banks, who suddenly and

unexpectedly resigned in 2014 as the US Attorney's investigations were scrutinizing another trip to Israel that Banks took along with Norman Seabrook, the now federally indicted former president of the New York City Correction Officers' Union.  Charged alongside James Grant (former commanding officer of the 19th Precinct) was Michael Harrington, a Deputy Chief assigned as the Executive Officer in the Chief of Department's office, and worked directly below Banks.

51.   Accompanying Mark DiPaolo and Phillip Banks to Israel was Brooklyn Borough President Eric Adams, who has personally directed funding to Shomrim for bulletproof vests, and who appeared at the ribbon cutting for a $300,000.00 Shomrim "search and rescue" "command post" that has markings virtually indistinguishable from those of the NYPD.[4]  Literally cutting the ribbon at that unveiling was Deputy Chief John Sprague, who has since been stripped of his gun and badge for invoking his Fifth Amendment privilege against self-incrimination upon being subpoenaed to testify in the Grand Jury investigation into James Grant and Michael Harrington, among others. Holding the ribbon with him is Shomrim leader Shaya Lichtenstein, who is currently under federal indictment as described above.

---

[4]      The "Search and Rescue" "command post" was approved in response to the horrific kidnapping and murder of Leiby Kletzky, a young orthodox boy from Borough Park.  Although a Shomrim group was notified when the boy was missing, the Shomrim group conducted their own investigation and did not notify the NYPD for three hours, a "longstanding issue with Shomrim", according to then Police Commissioner Ray Kelly.  The City's answer to that delay, however, was to lavish additional resources, such as the "search and rescue" "command post" upon the community- presumably to assist in future searches and rescues in similar matters.  This is further evidence that the City delegates public functions to the Shomrim.





The unveiling of a $300,000.00 Shomrim "Seach and Rescue Command Post", with New York City Council Member David Greenfield, indicted Shomrim leader Shaya Lichtenstein, and Deputy Chief John Sprague, who has since been stripped of his gun and badge for invoking his Fifth Amendment privilege against self-incrimination in the Grand Jury investigation into Lichtenstein and other high ranking NYPD members.

<u>THE LONG HISTORY OF DISPARATE TREATMENT IN THE COMMUNITY</u>

52.     Favoritism and preferential treatment between the NYPD and the orthodox Jewish communities of Brooklyn has openly existed for many years.  Retired police captain William Plackenmeyer told Newsday in 2003, "In Brooklyn, it almost seemed like there were two penal codes, one for the Hasidic community and one for everyone else".

53.   Orthodox Jewish communities and the Shomrim groups have well known "fixers" and "liasons" to the NYPD, with desks within the very precincts.  It has been utterly commonplace for those "fixers" to intervene and assist in avoiding and voiding arrests of Jewish crime suspects, undercharging Jewish crime suspects, giving preferential treatment to those Jewish Crime suspects who are actually arrested by issuing discretionary "desk appearance tickets" to Jewish crime suspects, and intervening with the Kings County District Attorney's office, which historically had its own "fixers" through whom all arrests of orthodox Jewish suspects had to be run.

54.   In 1990, the Kings County District Attorney convened a "Jewish advisory council," which kept leaders abreast of cases involving Jewish defendants or complainants.  The council was replaced by the office's full-time "liaison" to the Hasidic community for many years, Henna White, who had to be kept in the loop in virtually every case involving either orthodox Jewish victims or defendants, and who was very influential in the disposition of such matters.  The office had no such councils or liaison to any other religious or racial community.

55.   The anonymous on-line NYPD message board "Thee Rant" contains countless outraged examples of preferential treatment of the orthodox Jewish communities (often expressed in abhorrent and unfortunate anti-Semitic language).   Such preferential treatment was not an "open secret", and the messages on Thee Rant are not mere anecdotes; it has simply been common knowledge throughout and up to the highest levels of the NYPD and the communities where the Shomrim, orthodox communities, and other communities exist side by side.  In fact, although this complaint uses the phrase "fixer" in quotations, the term is part of the common lexicon of police and Shomrim members alike in the communities within which the Shomrim operate.

56. For many years, members of Taj Patterson's community have complained, in Community Board meetings, in the press, in federal lawsuits, and in other venues, about the preferential treatment the 90th Precinct accorded members of the orthodox Jewish community in Williamsburg.[5] For years, reporters and commentators have reported on and complained in the press about the dangerous power the Shomrim groups had, and the undue influence the Orthodox Jewish community had on the NYPD and the Kings County District Attorney's office. Taj Patterson's brutal beating, and his lack of access to adequate justice, was the inevitable result of the City's refusal to address these issues.

<u>**FIRST CAUSE OF ACTION**</u>
**42 U.S.C. § 1983- FALSE IMPRISONMENT AND EXCESSIVE FORCE AS TO ABRAHAM WINKLER, AHARON HOLLENDER, MAYER HERSKOVIC, JOSEPH FRIED, PINCHAS BRAVER, AND YOELI ITZKOWITZ**

57. All other paragraphs of this complaint are here incorporated by reference.

58. Defendants acted under color of law and deprived Plaintiff of his civil, constitutional and statutory rights to be free from unreasonable search and seizure, specifically, plaintiff's right to be free from false arrest and imprisonment and excessive force, when they detained and imprisoned plaintiff without probable cause or reasonable suspicion, and are liable to plaintiff under 42 U.S.C. §§ 1983.

59. WSP is a willful participant in joint activity with the state, is controlled by the state or an agency thereof; has been delegated a public function by the state; is entwined with governmental policies; and is entwined in the entity's management or

---

[5]     In fact, the deplorable "Crown Heights" riot in 1991, and the tragic murder of Yankel Rosenbaum, a young orthodox Jew in those riots, was sparked by what the Second Circuit referred to as complaints about "preferential treatment that Jews allegedly received". Rosenbaum's murderer was prosecuted in federal court under a statute that criminalized "concededly private, bias-motivated violence against a person because of that person's Jewishness and because that person was enjoying the use of a city street"- a precise analogue to this matter.

control.

60. The Government did more than adopt a passive position toward the underlying conduct of the Shomrim, and it delegated its obligations to the Shomrim groups in the communities in which they performed. Rather, the Shomrim performed what is traditionally the exclusive prerogative of the State, as descsribed in the "parties" section above.

61. Plaintiff was aware of his confinement and did not consent to it.

62. Plaintiff has been damaged as a result of defendants' wrongful acts.

## SECOND CAUSE OF ACTION
**42 U.S.C. § 1983- AS TO THE CITY OF NEW YORK, WILLIAMSBURG SAFETY PATROL, INC., AND SHMIRA VOLUNTEER PATROL CORP-MUNICIPAL AND CORPORATE LIABILITY FOR THE VIOLATIONS OF PLAINTIFF'S FOURTH AMENDMENT RIGHTS**

63. All other paragraphs in this complaint are here incorporated by reference.

64. The City, through its high level policy makers within the NYPD, has made a deliberate, conscious choice to allow the Shomrim groups to engage in law enforcement activities on behalf of the City, without training the Shomrim in the proper predicates for street stops and proper levels of force to be used in a street stop. The NYPD has regularly taken custody of individuals initially apprehended by the Shomrim, who have significant injuries, and yet has failed to inquire into the source of the injuries, which often resulted from excessive force by the Shomrim members. The City's policies have essentially created a private police force with special connections to the NYPD, funded and outfitted by the City, without any supervision of that force. The City is liable for the damages suffered by Plaintiff because it has created policies or customs under which unconstitutional practices regularly occur and even thrive.

65.     The practices described in this Complaint comprise both formal policies, and practices so consistent and widespread that, although not expressly authorized, constitute a custom or usage of which supervising policy-makers must have been aware, and policymakers failed to provide adequate training or supervision to subordinates to such an extent that it amounted to deliberate indifference to the rights of those who come into contact with members of the NYPD and the Shomrim.

66.     The City's deliberate indifference caused Plaintiff's injuries.

67.     WSP has been deliberately indifferent to the constitutional rights of individuals who come into contact with its members, as it has had a policy of permitting its members to stop individuals on the street at their whim, without any legal justification.

68.     WSP has failed to train its members in legal justifications for citizens' arrests.

### THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983- AS TO THE CITY OF NEW YORK, WILLIAMSBURG SAFETY PATROL, INC., AND SHMIRA VOLUNTEER PATROL CORP- FOR VIOLATIONS OF PLAINTIFF'S FOURTEENTH AMENDMENT EQUAL PROTECTION RIGHTS

69.     All other paragraphs in this complaint are here incorporated by reference.

70.     The policies of the City of New York have violated Plaintiff's constitutional right to have police services administered in a nondiscriminatory manner. The unequal treatment Plaintiff received from the NYPD was based upon the fact that he was a gay Black gentile, as opposed to the more favorable treatment accorded similarly situated crime victims who were straight, Caucasian and Jewish.

71.     The City's unwritten but long standing policies described above selectively denied its protective services to certain disfavored minorities within Plaintiff's

neighborhood and other neighborhoods where the Shomrim groups operate.

72.     Plaintiff was treated differently from other similarly situated individuals, based on impermissible considerations such as sexual preference, race or religion, and defendants' actions or inactions were at least in part because of, not merely in spite of, their adverse effects upon Plaintiff by reason of illegitimate consideration of Plaintiff's race and religion.

73.     WSP has been deliberately indifferent to the constitutional rights of individuals who come into contact with its members, as it has had a policy of permitting its members to stop individuals on the street at their whim, without any legal justification.

74.     WSP had a policy of encouraging its members to stop anyone who appeared suspicious to them, resulting in frequent treatment of gentile, black individuals who were in neighborhoods frequented by Orthodox Jews.

**FOURTH CAUSE OF ACTION**
**42 U.S.C. § 1983 AS TO POLICE OFFICER**
**RODRIGO FERNANDEZ, SERGEANT IVAN**
**FURDA AND SERGEANT ZAIKOWSKI, FOR**
**VIOLATIONS OF PLAINTIFF'S FOURTEENTH**
**AMENDMENT EQUAL PROTECTION RIGHTS**

75.     All other paragraphs in this complaint are here incorporated by reference.

76.     Defendants Officer Fernandez, Sergeant Furda, and Sergeant Zaikowski intentionally violated Plaintiff's constitutional right to have police services administered in a nondiscriminatory manner.  This resulted from the unequal treatment they gave Plaintiff as a gay Black gentile, as opposed to the more favorable treatment they would have accorded similarly situated crime victims who were straight, Caucasian and Jewish, as well as the more favorable treatment they gave Plaintiff's assailants, who they knew to be straight, white Jews.

77.     Defendants treated Plaintiff differently from other similarly situated individuals, based on impermissible considerations such as sexual preference. race or religion, and defendants' actions or inactions were at least in part because of, not merely in spite of, their adverse effects upon Plaintiff by reason of illegitimate consideration of Plaintiff's sexual preference, race, or religion.

### FIFTH CAUSE OF ACTION
**42 USC § 1985 AS TO ABRAHAM WINKLER, AHARON HOLLENDER, MAYER HERSKOVIC, JOSEPH FRIED, PINCHAS BRAVER, YOELI ITZKOWITZ**

78.     All other paragraphs in this complaint are here incorporated by reference.

79.     Defendants conspired among themselves between approximately 3:00 AM on December 1, 2013, and 5:00 AM on December 1, 2013, for the purpose of depriving Plaintiff, either directly or indirectly, equal protection of the laws, or equal privileges and immunities under the law, including the privilege of using the public streets.

80.     Defendants performed acts in furtherance of the conspiracy.

81.     Defendants' acts injured Plaintiff in his person or property or and deprived him of a right or privilege of a citizen of the United States.

### SIXTH CAUSE OF ACTION
**42 USC § 1985 AS TO POLICE OFFICER RODRIGO FERNANDEZ, SERGEANT IVAN FURDA, SERGEANT ZAIKOWSKI ABRAHAM WINKLER, AHARON HOLLENDER, MAYER HERSKOVIC, JOSEPH FRIED, PINCHAS BRAVER, YOELI ITZKOWITZ**

82.     All other paragraphs in this complaint are here incorporated by reference.

83.     Defendants conspired among themselves between approximately 4:45 AM on December 1, 2013, and 5:00 AM on December 2, 2013, for the purpose of impeding, hindering, obstructing, or defeating the due course of justice, with intent to deny Plaintiff

22

the equal protection of the laws.

84. Defendants formed a conspiracy for the purpose of depriving Plaintiff, either directly or indirectly, equal protection of the laws, or equal privileges and immunities under the law, including the right to equal access to justice.

85. Defendants performed acts in furtherance of the conspiracy.

86. Defendants' acts injured Plaintiff in his person or property or and deprived him of a right or privilege of a citizen of the United States.

## SEVENTH CAUSE OF ACTION
## RESPONDEAT SUPERIOR AS TO WILLIAMSBURG SAFETY PATROL, INC., AND SHMIRA VOLUNTEER PATROL CORP

87. All other paragraphs of this complaint are here incorporated byt reference.

88. WSP is liable under the doctrine of *respondeat superior* for the 42 USC §§ 1983, 1985 violations against Plaintiff, committed by the agents, employees, servants, and volunteers of WSP.

## DAMAGES

89. As a direct and proximate result of defendants' acts, Plaintiff suffered the following injuries and damages:

    a. Violation of his rights pursuant to the Fourth and Fourteenth Amendments of the United States Constitution;

    b. Severe physical pain and suffering and permanent physical injuries;

    c. Emotional trauma and suffering, including fear, embarrassment, humiliation, emotional distress, frustration, extreme inconvenience and anxiety;

    d. Loss of liberty.

WHEREFORE, Plaintiff demands judgment against the defendants, jointly and severally, as follows:

A.       In favor of Plaintiff in an amount to be determined by a jury for each of Plaintiff's causes of action;

B.       Awarding Plaintiff punitive damages in an amount to be determined by a jury;

C.       Awarding Plaintiff reasonable attorneys' fees, costs and disbursements of this action; and

D.       Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:        December 7, 2016
              Brooklyn, New York

                                        Respectfully yours,


                                        STOLL, GLICKMAN & BELLINA, LLP



                                        _____
                                        By: Andrew B. Stoll
                                        475 Atlantic Avenue, 3rd Floor
                                        Brooklyn, NY  11217
                                        (718) 852-3710
                                        astoll@stollglickman.com
                                        arobinson@stollglickman.com
                                        *Attorneys for Plaintiff*