UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

*DIF*

-----------------------------------------------------------------------X

TAJ PATTERSON,

                        Plaintiff,

       -against-

THE CITY OF NEW YORK et al.,

                       Defendants.

**MEMORANDUM & ORDER**

**16-CV-3525 (NGG) (SMG)**

-----------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

      Plaintiff Taj Patterson initiated this civil rights action on June 27, 2016, asserting claims

under 42 U.S.C. §§ 1983 and 1985 against the following groups of Defendants:

- The "Municipal Defendants," consisting of the City of New York ("the City") and three New York City Policy Department ("NYPD") officers (the "Officer Defendants"), Police Officer Rodrigo Fernandez, Sergeant Ivan Furda, and Sergeant Joseph Zaikowski, sued in their individual capacities;
- The "WSP Groups," consisting of the Williamsburg Safety Patrol, Inc., and the Shmira Volunteer Patrol Corp; and
- The "WSP Individual Defendants," consisting of Pinchas Braver, Mayer Herskovic, Abraham Winkler, Aharon Hollender, Joseph Fried, Yoeli Itzkowitz, and John Does #1 through #10.

(See Compl. (Dkt. 1); Am. Compl. (Dkt. 43).) Plaintiff asserts that Defendants violated his

constitutional rights in connection with an alleged assault on Plaintiff and the NYPD's

investigation thereof. Pending before the court are three dispositive motions:

- A motion to dismiss filed by the Municipal Defendants (Dkt. 50);
- A motion for judgment on the pleadings filed by WSP Individual Defendant Braver (Dkt. 52); and
- A motion to dismiss filed by WSP Individual Defendant Herskovic (Dkt. 63).

The WSP Groups and the non-moving WSP Individual Defendants have neither answered nor

appeared.

1

For the reasons set forth below, all three pending dispositive motions are GRANTED. Accordingly, all claims against the Municipal Defendants, Defendant Braver, and Defendant Herskovic are DISMISSED WITH PREJUDICE.

## I.     BACKGROUND

### A. Plaintiff's Allegations

1. The Relationship Between the City and the WSP Groups

The WSP Groups are "two of several neighborhood safety patrols organized and operated by volunteer orthodox Jews in different neighborhoods throughout Brooklyn," collectively referred to as the "Shomrim Groups." (Am. Compl. ¶ 10.) "The City [has] substantially [] funded and continues to fund the Shomrim groups," including by "purchas[ing] specific law enforcement equipment such as bullet proof vests, police radios for WSP to communicate directly with NYPD precincts, 'search and rescue command posts', and vehicles and uniforms that are virtually indistinguishable from NYPD vehicles." (Id. ¶ 11.) The WSP Individual Defendants named in this case were, at all relevant times, "members and employees of the Shomrim, or were working on behalf of the Shomrim." (Id. ¶ 21.)

Plaintiff alleges that the WSP Groups have a close relationship with various City and NYPD officials, including a "uniquely close working relationship" with the NYPD's 90th Precinct in the Williamsburg neighborhood of Brooklyn, New York. (Id. ¶ 24; see also id. ¶¶ 11-21, 52-56.) "Within the communities where the Shomrim groups operate, the majority of the orthodox Jewish citizens report law enforcement issues to the Shomrim groups first and usually exclusively, in lieu of the NYPD." (Id. ¶ 28.) "The Shomrim groups, including [the WSP Groups], often make arrests for and with the NYPD, and enjoy ready access to areas of NYPD precincts not otherwise open to the public." (Id. ¶ 12.) "When arresting individuals, the

[WSP Groups] profess to act pursuant to" New York's statutory authority for citizens' arrest. (Id. ¶ 13 (citing N.Y. Crim. Proc. Law § 140.30).)

Further, "Orthodox Jewish communities and the Shomrim groups have well known 'fixers' and '[liaisons]' to the NYPD, with desks within the very precincts." (Id. ¶ 53.) "[T]hose 'fixers' . . . assist in avoiding and voiding arrests of Jewish crime suspects, undercharging Jewish crime suspects, giving preferential treatment to those Jewish [c]rime suspects who are actually arrested by issuing discretionary 'desk appearance tickets' . . . , and intervening with the Kings County District Attorney's office." (Id.) The District Attorney's office, too, allegedly maintained a "full-time 'liaison' to the Hasidic community . . . , who had to be kept in the loop in virtually every case involving either orthodox Jewish victims or defendants." (Id. ¶ 54.) "The office had no such councils or liaison[s] to any other religious or racial community." (Id.)

## 2. The Assault

Plaintiff is a Black, gay, non-Jewish man who lives in a Brooklyn neighborhood with a large population of Orthodox Jews. (Id. ¶¶ 7, 23.) Plaintiff was walking through Brooklyn early in the morning on December 1, 2013, when he was spotted by two individuals, a Shomrim "enthusiast" and a former Shomrim employee.[1] (Id. ¶ 25.) Those individuals "believed Plaintiff was acting suspiciously"—one of the individuals later testified "that he believed . . . Plaintiff was vandalizing cars"—so they called the Williamsburg Safety Patrol "to report the suspicious behavior." (Id. ¶¶ 26-27.)

Plaintiff was then chased by a group that included WSP Individual Defendant Itzkowitz and "[m]any other individuals." (Id. ¶¶ 30-31.) "As Plaintiff struggled to escape the WSP members, he was attacked and beaten so severely it left him blind in one eye. As they were

---

[1] Neither of these individuals was named as a defendant in this action.

assaulting Plaintiff, defendants were using homophobic slurs." (Id. ¶ 33.) "Witnesses at the scene" called 911. (Id. ¶ 34.) The assault "ceased" once witnesses "got involved." (Id.) The Officer Defendants arrived and "gathered witness names and contact phone numbers," as well as witness accounts of "the assailants and their clothing, which consisted of some in official looking uniforms, and many in traditional orthodox Jewish clothing," as well as a license plate number for a car used by the assailants. (Id. ¶ 35.) An ambulance delivered Plaintiff to a hospital, where he received medical treatment. (Id. ¶¶ 36-37.)

### 3. The City's Investigation of the Assault

"While Plaintiff was being treated at the hospital," Shomrim members made "[c]alls to the precinct." (Id. ¶ 37.) "[T]he case was closed out, marked 'Final, No Arrests.'" (Id.) All three Officer Defendants "personally participated in the decision not to pursue an investigation into crimes committed against Plaintiff." (Id. ¶ 9.) Defendant Furda was "directly involved" in the decision "to close the case out with no further investigation or arrests," and ultimately had "disciplinary charges [] brought against him and he lost ten days' vacation in a negotiated disposition of the disciplinary matter." (Id. ¶ 46.) "Although witnesses [had] described the assailants in detail to the police at the scene of the incident, including that they appeared in every way to be orthodox Jews based on their clothing and hairstyles, Sergeant Furda claims he was the first officer to respond, and further claims that he did not even know the assailants appeared to be Jewish." (Id.)

After Plaintiff and his mother generated "press coverage of the matter," they "were contacted by the Hate Crimes Unit of the NYPD." (Id. ¶ 38-39.) The Hate Crimes Unit "worked

4

the case up" and "develop[ed] probable cause to arrest [WSP Individual Defendants] Winkler, Hollender, Herskovic, Fried, and Braver." (Id. ¶ 40.) Plaintiff asserts, however, that

> [h]ad the case been properly immediately forwarded to the Detective Squad at the 90th Precinct, [] further suspects would have been identified, and the evidence against the suspects that were identified would have been much stronger. Instead, evidence quickly disappeared, witnesses were able to prepare to be confronted by questioning, and as the criminal case proceeded, witnesses who were close to the Shomrim, who had identified some of the suspects, began to recant their statements, including their sworn Grand Jury testimony.

(Id. ¶¶ 41-42.)

Ultimately, the criminal cases against Hollender and Fried were dismissed, Braver and Winkler each "pled guilty to misdemeanor unlawful imprisonment for their roles in the matter," and Herskovic was convicted of gang assault in the second degree and unlawful imprisonment.[2] (Id. ¶¶ 43-44.)

In May 2015, "while [Braver's] criminal case was still pending, Braver received a special tour of the NYPD's 19th Precinct station house, where he was granted access to the 'muster room'—an area of the precinct that is not open to members of the public." (Id. ¶ 47 (footnote omitted).)

## B. Plaintiff's Causes of Action

Plaintiff asserts four causes of action under 42 U.S.C. § 1983:

(1) Fourth Amendment violations by the WSP Individual Defendants on the grounds that they acted under color of law while subjecting Plaintiff to false arrest, false imprisonment, and excessive force. (Am. Compl. ¶¶ 57-62.)

(2) Fourth Amendment violations by the City and the WSP Groups on the grounds that the City "essentially created a private police force with special connections to the NYPD, funded and outfitted by the City, without any supervision of that

---

[2] Defendant Herskovic's state conviction occurred after the filing of the Amended Complaint, but was discussed at a conference before the undersigned on April 6, 2017. Plaintiff does not dispute that the conviction occurred. (See Pl. Mem. in Opp'n to Herskovic Mot. to Dismiss (Dkt. 63-3) at 1.)

force," and so the City "is liable for the damages suffered by Plaintiff because it has created policies or customs under which unconstitutional practices regularly occur." (Id. ¶¶ 63-68.)

(3) Fourteenth Amendment violations by the Officer Defendants on the grounds that "the unequal treatment they gave Plaintiff as a gay Black gentile, as opposed to the more favorable treatment they would have accorded similarly situated crime victims who were straight, Caucasian and Jewish, as well as the more favorable treatment they gave Plaintiff's assailants, who they knew to be straight, white Jews." (Id. ¶¶ 75-77.)

(4) Fourteenth Amendment violations by the City and the WSP Groups on the grounds that "[t]he unequal treatment Plaintiff received from the NYPD was based upon the fact that he was a gay Black gentile, as opposed to the more favorable treatment accorded similarly situated crime victims who were straight, Caucasian and Jewish." (Id. ¶¶ 69-74.)

Plaintiff asserts two causes of action under 42 U.S.C. § 1985:

(5) Conspiracy to violate Plaintiff's civil rights by the WSP Individual Defendants based on the alleged assault. (Id. ¶¶ 78-81.)

(6) Conspiracy to violate Plaintiff's civil rights by the Officer Defendants and the WSP Individual Defendants based on the alleged interference with the investigation. (Id. ¶¶ 82-86.)

Plaintiff's final cause of action arises under the doctrine of respondeat superior:

(7) Respondeat superior liability for the WSP Groups for the actions of the WSP Individual Defendants. (Id. ¶¶ 87-88.)

## II.    SUMMARY OF HOLDING

The Amended Complaint describes a network of inappropriate ties between the NYPD, Orthodox Jewish communities, and community policing organizations. If these allegations are true, it would appear that certain NYPD officials have woven preferential treatment into the fabric of policing operations, producing disarmingly powerful private policing organizations that operate without formal training or supervision. Worse still, the police may be looking the other way when members of those organizations engage in criminal activity. Such behavior would merit immediate attention from policymakers, and may well support civil liability against the individuals involved.

In this action, however, no such civil liability will lie against the moving defendants. Plaintiff's allegations tell a troubling tale, but the facts of Plaintiff's case make a poor vehicle for certain claims, and the allegations in the Amended Complaint fail to meet the required elements of others. Plaintiff has failed to plausibly establish that the assault constituted "state action," and has therefore failed to establish a Fourth Amendment violation by the WSP Individual Defendants. Plaintiff alleges that various individuals acted with discriminatory intent, but muddles his Equal Protection claims by conflating discrimination in favor of Orthodox Jews with discrimination against Plaintiff on the basis of his race or sexuality. Plaintiff offers generalized accounts of preferential treatment, but offers neither concrete examples to substantiate those claims, nor particularized allegations that provide a clear connection to this case.

Thus, even if Plaintiff's allegations are true, they are insufficient as a matter of law to sustain his claims against the Municipal Defendants or WSP Individual Defendants Braver and Herskovic. Accordingly, the court dismisses with prejudice all claims asserted against the moving defendants.

## III.   LEGAL STANDARD FOR MOTIONS UNDER RULES 12(B)(6) AND 12(C)

Courts in the Second Circuit "employ the same standard" when analyzing motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) and motions for judgment on the pleadings under Rule 12(c). In re Arab Bank, PLC Alien Tort Statute Litig., 808 F.3d 144, 151 (2d Cir. 2015), as amended (Dec. 17, 2015) (alterations omitted) (quoting Johnson v. Rowley, 569 F.3d 40, 43 (2d Cir. 2009)). The court must "accept as true factual allegations made in the complaint, and draw all reasonable inferences in favor of the plaintiff[]." Id. (alterations omitted) (quoting Town of Babylon v. Fed. Hous. Fin. Agency, 699 F.3d 221, 227 (2d Cir. 2012)). This leniency, however, is "inapplicable to legal conclusions" or "[t]hreadbare recitals

of the elements of a cause of action, supported by mere conclusory statements." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss, "a complaint must plead specific facts sufficient to support a plausible inference that the defendant is liable for the misconduct alleged. While 'the plausibility standard is not akin to a probability requirement, it asks for more than a sheer possibility that a defendant has acted unlawfully.'" Doe v. Columbia Univ., 831 F.3d 46, 54 (2d Cir. 2016) (internal citations and alterations omitted) (quoting Iqbal, 556 U.S. at 678).

## IV.   SECTION 1983 CLAIMS

### A. Legal Standard

"To state a claim under § 1983, a plaintiff must allege that defendants violated plaintiff's federal rights while acting under color of state law."[3] McGugan v. Aldana-Bernier, 752 F.3d 224, 229 (2d Cir. 2014), cert. denied, 135 S. Ct. 1703 (2015) (citing 42 U.S.C. § 1983; Washington v. Cty. of Rockland, 373 F.3d 310, 315 (2d Cir. 2004)).

"[A] municipality may not be held liable under [Section] 1983 for an injury inflicted by its agents unless 'the challenged acts were performed pursuant to a municipal policy or custom.'" Vill. of Freeport v. Barrella, 814 F.3d 594, 616 (2d Cir. 2016) (quoting Littlejohn v. City of N.Y., 795 F.3d 297, 314 (2d Cir. 2015)); see generally Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978). A corollary of that standard is that if a plaintiff "fail[s] to allege any underlying violation of his statutory or constitutional rights by a municipal official, there can be no Monell liability." Alston v. Sebelius, No. 13-CV-4537 (SJF) (ARL), 2014 WL 4374644, at *16 (E.D.N.Y. Sept. 2, 2014) (citation omitted).

---

[3] "If a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, the conduct also constitutes action 'under color of state law' for § 1983 purposes." Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 n.2 (2001) (citing Lugar v. Edmondson Oil Co., 457 U.S. 922, 935 (1982)).

**B. The Fourth Amendment Claim Against Defendants Braver and Herskovic**

Plaintiff asserts that the WSP Individual Defendants "acted under color of law" when they chased and assaulted him, thereby depriving Plaintiff of his Fourth Amendment rights against false arrest, false imprisonment, and excessive force. (Am. Compl. ¶ 58.) The court finds that Plaintiff has failed to sufficiently allege state action by Defendants Braver and Herskovic, and therefore dismisses Plaintiff's Section 1983 Fourth Amendment claim against these individuals.

> "A private entity acts under color of state law for purposes of § 1983 when:
>
> > (1) the State compelled the conduct [the "compulsion test"], (2) there is a sufficiently close nexus between the State and the private conduct [the "close nexus test" or "joint action test"], or (3) the private conduct consisted of activity that has traditionally been the exclusive prerogative of the State [the "public function test"]. The fundamental question under each test is whether the private entity's challenged actions are fairly attributable to the state.

McGugan, 752 F.3d at 229 (internal quotation marks and citations omitted). Plaintiff argues that the WSP Groups and WSP Individual Defendants qualify as state actors under both the "joint action" and "public function" tests.[4] (See Am. Compl. ¶ 20.)

1. The "Joint Action" Test

The parties spar over the proper formulation of the "joint action" test. In particular, they dispute whether the court should focus on the specific conduct at issue, or on the broader relationships that contextualize that conduct. (Compare, e.g., Municipal Defs. Mem. in Supp. of Mot. to Dismiss (Dkt. 51) at 8-10, with Pl. Mem. in Opp'n to Municipal Defs. Mot. & Braver

---

[4] The phrasing in the Amended Complaint could also be read as asserting a claim under the "compulsion test." (Am. Compl. ¶ 59.) However, Plaintiff made no argument under that theory in opposing Defendants' dispositive motions, and so the court deems the argument waived.

Mot. ("Pl. Opp'n") (Dkt. 54) at 2-12.) Both formulations find support in the case law. The court

finds that Plaintiff has failed to successfully allege state action under either standard.

Courts "begin the fair attribution inquiry by identifying 'the specific conduct of which the

plaintiff complains, rather than the general characteristics of the entity.'" Grogan v. Blooming

Grove Volunteer Ambulance Corps, 768 F.3d 259, 264 (2d Cir. 2014) (quoting Fabrikant v.

French, 691 F.3d 193, 207 (2d Cir. 2012)). "It is not enough [] for a plaintiff to plead state

involvement in 'some activity of the institution alleged to have inflicted injury upon a plaintiff';

rather, the plaintiff must allege that the state was involved 'with the activity that caused the

injury' giving rise to the action." Sybalski v. Indep. Grp. Home Living Prog., Inc., 546 F.3d 255,

257-58 (2d Cir. 2008) (emphasis added) (quoting Schlein v. Milford Hosp., Inc., 561 F.2d 427,

428 (2d Cir. 1977)).

The court finds no allegation suggesting direct state involvement in the assault itself.

Plaintiff has not alleged that an NYPD officer or other state official played any role in targeting,

pursuing, or assaulting Plaintiff. The NYPD was first contacted by witnesses after the assault on

Plaintiff had already begun, and the assault ended before the police arrived on the scene. Thus,

under the narrower formulation of the "joint action" test, Plaintiff has failed to plausibly allege

that "the state is 'responsible for the specific conduct'" that caused his injuries. Fabrikant,

691 F.3d at 207 (emphasis omitted) (quoting Cranley v. Nat'l Life Ins. Co. of Vt., 318 F.3d 105,

111 (2d Cir. 2003)); see, e.g., McGugan, 752 F.3d at 229-30 (holding that "the forcible

medication and hospitalization of [the plaintiff] by private health care providers" could not

"fairly be attributed to the state," even though "state actors transported her" to the hospital,

because the plaintiff did "not allege that state actors requested, much less compelled [the

hospital] or its staff to involuntarily hospitalize her" (citing Doe v. Rosenberg, 166 F.3d 507

(2d Cir. 1999)); Grogan, 768 F.3d at 269 (finding no state action in plaintiff's suspension by the volunteer ambulance corps based, in part, on plaintiff's failure to "present[] any evidence to suggest that the Town played any role in the disciplinary process that resulted in her suspension").

Plaintiff is correct, however, that the "joint action" test has also been applied in a more expansive manner. Under the so-called "entwinement" theory,[5] "state action may exist when a private entity 'is entwined with governmental policies, or when government is entwined in its management or control.'" Grogan, 768 F.3d at 268 (quoting Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 296 (2001)). Here, too, Plaintiff's allegations fail to plausibly establish state action.

Plaintiff emphasizes his allegations of substantial public funding for WSP Group equipment. (Pl. Opp'n at 4; see also Am. Compl. ¶ 20 (The WSP Groups "are controlled by the City Council through its ability to fund them.").) The Second Circuit has clearly stated, however, that "a private entity does not become a state actor for purposes of § 1983 merely on the basis of 'the private entity's creation, funding, licensing, or regulation by the government.'" Fabrikant, 691 F.3d at 207 (quoting Cranley, 318 F.3d at 112); see, e.g., Grogan, 768 F.3d at 269 (finding no entwinement even though the volunteer ambulance corps "derives the vast majority of its funding from public sources").

Plaintiff also highlights allegations concerning friendly interactions among WSP Group members and NYPD personnel, public statements from NYPD and City officials applauding the

---

[5] Plaintiff argues in favor of applying the "symbiosis" theory derived from the Supreme Court's decision in Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961). (See, e.g., Pl. Opp'n at 11.) "Supreme Court decisional law has given Burton a very narrow interpretation," however. Khulumani v. Barclay Nat'l Bank Ltd., 504 F.3d 254, 314 n.8 (2d Cir. 2007) (Korman, J., concurring). This court will, instead, apply the related "entwinement" theory that has been favorably applied in more recent Supreme Court and Second Circuit case law, as Plaintiff himself acknowledges. (See Pl. Opp'n at 11 (citing Brentwood, 531 U.S. 288).)

WSP Groups for their work, and the various types of activities that the WSP Groups perform on behalf of, or in conjunction with, the NYPD. (See Pl. Opp'n at 4-5; Am. Compl. ¶¶ 11-28.) Crucially absent, however, is any allegation that the City is "entwined" in the "management or control" of the WSP Groups' operations. Grogan, 768 F.3d at 268 (emphasis added) (citation omitted). Indeed, although Plaintiff asserts that the WSP Groups are essentially "an extension of the NYPD", Plaintiff explicitly acknowledges that they "are completely outside the authority of the City of New York." (Am. Compl. ¶ 19.)

On the facts of this case, the allegations of state collaboration—without any allegation of state control—do not rise to the level of state action necessary to impose Section 1983 liability on a private party. See Grogan, 768 F.3d at 263 ("The purpose of the state action requirement is," in part, to "avoid imposing 'responsibility on a State for conduct it could not control.'" (quoting Brentwood, 531 U.S. at 295)); see also, e.g., id. at 269 (finding no state action in a volunteer ambulance corps' decision to suspend the plaintiff where plaintiff "introduced no evidence suggesting that the Town appoints any portion of [corps'] Board or has any say in [the corps'] management or personnel decisions"); id. at 268-69 (discussing Horvath v. Westport Library Assoc., 362 F.3d 147 (2d Cir. 2004), and noting that "the decisive factor" in that case was "the amount of control that Westport could potentially exercise over the library's 'internal management decisions,' as shown by the town's authority to appoint one-half of the library's board of directors"); Sybalski, 546 F.3d at 259 ("While the State of New York has established procedures governing the limitations that mental health facilities place on the ability of patients to receive visitors, the administrators of those facilities make the decision about whether such limitations should be imposed," and "the state's involvement" via regulation "is insufficient to render that decision 'state action.'").

The court finds that Plaintiff has failed to plausibly allege "joint action" sufficient to impose Section 1983 liability on WSP Individual Defendants Braver or Herskovic.

## 2. The "Public Function" Test

"Under the public function test, '[s]tate action may be found in situations where an activity that traditionally has been the exclusive, or near exclusive, function of the State has been contracted out to a private entity.'" Grogan, 768 F.3d at 264-65 (quoting Horvath, 362 F.3d at 151). "This test . . . focuses not on whether the activity delegated to the private entity has been regularly performed by governments, but instead on whether the activity historically has been 'an exclusive prerogative of the sovereign.'" Id. at 265 (quoting Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 159 (1978)).

Plaintiff alleges that the WSP Groups purport to make arrests pursuant to New York's statutory authority for citizens' arrest.[6] (Am. Compl. ¶ 13 (citing N.Y. Crim. Proc. Law § 140.30).) "[I]t is well-established," however, "that private citizens may effectuate arrests without becoming state actors."[7] Forbes v. City of N.Y., No. 05-CV-7331 (NRM), 2008 WL 3539936, at *5 (S.D.N.Y. Aug. 12, 2008) (collecting cases); see also Walters v. Suffolk Cty., No. 09-CV-556 (MKB), 2014 WL 940734, at *8 (E.D.N.Y. Mar. 11, 2014) (collecting cases in

---

[6] Plaintiff argues that "the Shomrim perform [various] policing functions, including crowd control, responding to emergency calls, and apprehension of criminal suspects." (Pl. Opp'n at 9.) Only that last function is at issue in this cause of action, however. There is no allegation that Plaintiff's assault was connected with WSP Group crowd control activities. Rather, this case involves an instance where "orthodox Jewish citizens report[ed a] law enforcement issue[] to the Shomrim groups first and [] exclusively, in lieu of the NYPD." (Am. Compl. ¶ 28.) This case, then, does not present a scenario in which the WSP Groups "intervene[d] in law enforcement matters." (Id. ¶ 20.) Plaintiff's assault did not become a "law enforcement matter" until eyewitnesses independently called 911. (Id. ¶¶ 34-35.)

[7] This principle may derive from the fact that "New York law applies different substantive standards to citizens' and officers' arrests." Liranzo v. United States, 690 F.3d 78, 96 (2d Cir. 2012) (citing 59 N.Y. Jur.2d False Imprisonment § 37). Unlike a police officer, "a private citizen who makes an arrest does so at his peril; if the person arrested did not in fact commit the crime for which he is arrested, the person who arrests him is liable for false arrest even if he acts in good faith or has probable cause to make an arrest." Id. (alteration omitted) (quoting White v. Albany Med. Ctr. Hosp., 151 A.D.2d 859, 860 (N.Y. App. Div. 1989)). Citizens' arrest is thus far from coextensive with the police arrest power, and is clearly intended as an adjunct to—and not a substitute for—that power.

support of the proposition that "[d]etaining a supposed criminal while police respond does not expose a private actor to § 1983 liability"). Plaintiff has failed to establish that the WSP Groups' alleged reliance on the citizens' arrest statute transformed all related conduct into state action under the "public function" test.

*    *    *

Plaintiff has failed to plausibly allege state action in connection with the assault under either the "joint action" or "public function" tests. The court therefore dismisses Plaintiff's Section 1983 Fourth Amendment claim against Defendants Braver and Herskovic.

### C. The Fourth Amendment Claim Against the City

The City can only be held liable under Section 1983 if Plaintiff first establishes a primary constitutional violation. Barrella, 814 F.3d at 616. Plaintiff has failed to plausibly allege a primary Fourth Amendment violation by Defendants Braver and Herskovic, and has not asserted Fourth Amendment claims against any of the Officer Defendants. At this time, the court has not been called upon to adjudicate the validity of Plaintiff's Fourth Amendment claims against the WSP Groups or the non-moving WSP Individual Defendants. The court notes, however, that Plaintiff's pertinent allegations are substantially identical as to all WSP Individual Defendants.[8] Based on the analysis above, therefore, the court finds that Plaintiff has failed to plausibly allege state action by any WSP Individual Defendant in connection with Plaintiff's assault. Absent state action by any individual involved in the assault, Plaintiff has failed to establish a primary Fourth Amendment violation. Plaintiff's Fourth Amendment claim against the City must therefore be dismissed.

---

[8] Defendant Itzkowitz is alleged to have been one of "[t]he first three people chasing Plaintiff" before the other WSP Individual Defendants arrived. (Am. Compl. ¶ 30.) The court finds no basis for concluding that this allegation might affect the determination of whether or not any Defendant's conduct constituted "state action."

**D. The Fourteenth Amendment Claims Against the Municipal Defendants**

Plaintiff asserts that the Officer Defendants "intentionally violated Plaintiff's constitutional right to have police services administered in a nondiscriminatory manner" based on "the unequal treatment they gave Plaintiff as a gay Black gentile, as opposed to the more favorable treatment they would have accorded similarly situated crime victims who were straight, Caucasian and Jewish, as well as the more favorable treatment they gave Plaintiff's assailants, who they knew to be straight, white Jews." (Am. Compl. ¶ 76.) Plaintiff asserts that the City, too, is liable for these violations. (Id. ¶¶ 70-72.) Though Plaintiff asserts these claims under the heading "Fourteenth Amendment Equal Protection Rights" in the Amended Complaint, Plaintiff's allegations could also be construed as asserting claims under the Due Process Clause of the Fourteenth Amendment. The court finds, however, that Plaintiff's allegations fail to adequately support either legal theory, and therefore dismisses Plaintiff's Fourteenth Amendment claims against both the Officer Defendants and the City.

     1. Legal Standards

        *a. Equal Protection and Selective Denial of Services*

"It is well-settled that § 1983 does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." AYDM Assocs., LLC v. Town of Pamelia, 205 F. Supp. 3d 252, 264 (N.D.N.Y. 2016), aff'd, No. 16-3269-CV, 2017 WL 2471234 (2d Cir. June 8, 2017) (quoting Morris-Hayes v. Bd. of Educ. of Chester Union Free Sch. Dist., 423 F.3d 153, 159 (2d Cir. 2005)). "[T]he Equal Protection Clause 'is essentially a direction that all persons similarly situated should be treated alike.'" Kwong v. Bloomberg, 723 F.3d 160, 169 (2d Cir. 2013) (quoting City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985)). Although "the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process

Clause," Harrington v. Cty. of Suffolk, 607 F.3d 31, 34 (2d Cir. 2010) (emphasis added) (citation omitted), "[t]he State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause," DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197 n.3 (1989) (emphasis added) (citing Yick Wo v. Hopkins, 118 U.S. 356 (1886)); see also, e.g., Myers v. Cty. of Orange, 157 F.3d 66 (2d Cir. 1998) (holding that a municipal policy of investigating only first-filed complaints—and ignoring cross-complaints—violated the Equal Protection Clause).

### i. Discriminatory Intent

"It is well established that '[p]roof of racially discriminatory intent or purpose is required' to show a violation of the Equal Protection Clause." Reynolds v. Barrett, 685 F.3d 193, 201 (2d Cir. 2012) (quoting City of Cuyahoga Falls v. Buckeye Cmty. Hope Found., 538 U.S. 188, 194 (2003)). "[I]ntent, like any state of mind, may be proved by circumstances reasonably supporting an inference of the requisite intent." United States v. City of N.Y., 717 F.3d 72, 93 (2d Cir. 2013) (emphasis added) (citing Blue v. Koren, 72 F.3d 1075, 1084 (2d Cir. 1995)). That said, "purposeful discrimination requires more than intent as volition or intent as awareness of consequences. It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, [the action's] adverse effects upon an identifiable group." Id. (quoting Iqbal, 556 U.S. at 676-77).

### ii. Selective Prosecution vs. Selective Denial of Services

District courts within the Second Circuit have applied two distinct formulas when assessing challenges like the one presented here. Some courts have applied the framework for selective prosecution—also called "selective enforcement" or "selective treatment"—which requires a plaintiff to show "(1) [that] the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible

16

considerations such as race [or] religion." Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 234 (2d Cir. 2004) (quoting Lisa's Party City, Inc. v. Town of Henrietta, 185 F.3d 12, 16 (2d Cir. 1999)); see, e.g., Troy v. City of N.Y., No. 13-CV-5082 (AJN), 2014 WL 4804479, at *10 (S.D.N.Y. Sept. 25, 2014), aff'd, 614 F. App'x 32 (2d Cir. 2015) (applying this framework to the claim that a detective "refused to investigate Plaintiff's complaint and threatened to arrest Plaintiff because she is a woman and because she is Jewish").

This court agrees with the alternative view, however, which holds that selective prosecution claims are properly "brought by plaintiffs against whom state actors selectively enforced the law in an allegedly discriminatory manner." White v. City of N.Y., 206 F. Supp. 3d 920 (S.D.N.Y. 2016) (emphasis added) (collecting cases); see also Pyke v. Cuomo ("Pyke I"), 258 F.3d 107, 109 (2d Cir. 2001) ("[A] plaintiff alleging a claim of selective prosecution . . . must plead and establish the existence of similarly situated individuals who were not prosecuted." (second emphasis added)). Such claims require explicit comparators "because courts grant special deference to the executive branch in the performance of the 'core' executive function of deciding whether to prosecute." Id.

This court will, instead, apply the more general framework for "discriminatory application of the law" articulated in Pyke I. Id. at 109. In that case, the Second Circuit addressed a claim similar to the one presented here: the plaintiffs alleged that state officials "discriminatorily declined to provide plaintiffs with police protection on the reservation because the persons in need of protection were Native Americans." Id. at 108. As the Second Circuit explained:

> [A] plaintiff seeking to establish a violation of equal protection by intentional discrimination may proceed in "several ways," including by pointing to a law that expressly classifies on the basis of race, a facially neutral law or policy that has been applied in an unlawfully

17

> discriminatory manner, or a facially neutral policy that has an adverse effect and that was motivated by discriminatory animus.

Id. at 110 (quoting Brown v. City of Oneonta, 221 F.3d 329, 337 (2d Cir. 2000)). A plaintiff asserting any of these three theories "is not obligated to show a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection."[9] Id.

In this case, Plaintiff has not alleged any express racial classifications, and so the court construes Plaintiff's Equal Protection claim as challenging the application of a facially neutral policy. Plaintiff therefore "'bear[s] the burden of making out a prima facie case'" that "Defendants' actions were 'motivated by discriminatory animus,'" and that their "'application results in a discriminatory effect.'" Pyke v. Cuomo ("Pyke II"), 567 F.3d 74, 78 (2d Cir. 2009) (quoting Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev., 438 F.3d 195, 204 (2d Cir. 2006)).

### b. Substantive Due Process and State-Created Dangers

Plaintiff acknowledges that his "argument is less a due process argument than an equal protection argument." (Pl. Opp'n at 18.) Indeed, the Amended Complaint explicitly labels the Fourteenth Amendment claims as "Equal Protection" violations. (Am. Compl. at 19-20.) In Plaintiff's opposition papers, however, he asserts in a footnote that "the Amended Complaint is sufficient to support a Due Process argument as well." (Pl. Opp'n at 18 & n.6 (citing Pena v. DePrisco, 432 F.3d 98, 111 (2d Cir. 2005)).

---

[9] Though the court affirmatively selects the Pyke I standard for selective denial of services because of its endorsement in a precedential opinion, the court notes that this choice has no bearing on the outcome of the case. Under the "selective prosecution" standard described above, Plaintiff's Equal Protection claims would be dismissed due to Plaintiff's failure to include allegations regarding any similarly situated comparators.

The court is conscious that the "[f]ederal pleading rules . . . do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." Johnson v. City of Shelby, 135 S. Ct. 346, 346 (2014) (per curiam); see also 5 Charles Alan Wright et al., Fed. Prac. & Proc. § 1219 (2016 ed.). Even "[a] failure to specify 42 U.S.C. § 1983 as the vehicle for pleading a constitutional claim is not a defect warranting dismissal" as long as "plaintiffs have 'informed [the defendant] of the factual basis for their complaint.'" Smith v. Campbell, 782 F.3d 93, 99 (2d Cir. 2015) (quoting Johnson, 135 S. Ct. at 347)). Thus, the court will also consider whether Plaintiff has adequately pled a Due Process violation against either the Officer Defendants or the City.

It is well-settled that Plaintiff cannot assert a constitutionally protected property interest based on the expectation that the NYPD would prosecute his assailants. Harrington, 607 F.3d at 34-36; Town of Castle Rock v. Gonzales, 545 U.S. 748, 768 (2005). Under the so-called "state-created danger" doctrine, however, "state actors may be liable under section 1983" for a substantive Due Process violation "if they affirmatively created or enhanced the danger of private violence." Okin v. Vill. of Cornwall-on-Hudson Police Dep't, 577 F.3d 415, 428 (2d Cir. 2009) (emphasis added) (citing Dwares v. City of N.Y., 985 F.2d 94, 99 (2d Cir.1993), overruled on other grounds by Leatherman v. Tarrant Cty. Narcotics Intel. & Coord. Unit, 507 U.S. 163, 164 (1993)).

"[T]he Due Process Clause may be violated when police officers' affirmative conduct . . . creates or increases the risk of private violence." Id. (discussing Hemphill v. Schott, 141 F.3d 412 (2d Cir. 1998)). In addition, "repeated, sustained inaction by government officials, in the face of potential acts of violence, might constitute 'prior assurances' rising to the level of an affirmative condoning of private violence, even if there is no explicit approval or

19

encouragement." Id. (quoting Dwares, 985 F.2d at 99, and citing Pena, 432 F.3d 98). Finally,

"[t]o establish a violation of substantive due process rights, a plaintiff must demonstrate that the

state action was 'so egregious, so outrageous, that it may fairly be said to shock the

contemporary conscience.'" Id. at 431 (quoting Cty. of Sacramento v. Lewis, 523 U.S. 833,

847 n.8 (1998)); see also id. ("[I]ntentionally inflicted injuries are the 'most likely to rise to the

conscience-shocking level.'" (quoting Lewis, 523 U.S. at 849)).

### c. Qualified Immunity

"Government officials are entitled to qualified immunity with respect to 'discretionary

functions' performed in their official capacities." Ziglar v. Abbasi, 137 S. Ct. 1843, 1866 (2017)

(quoting Anderson v. Creighton, 483 U.S. 635, 638 (1987)). "The doctrine of qualified

immunity shields officials from civil liability so long as their conduct does not violate clearly

established constitutional rights of which a reasonable person would have known."[10] Hernandez

v. Mesa, 137 S. Ct. 2003, 2007 (2017) (per curiam) (alteration omitted) (quoting Mullenix v.

Luna, 136 S. Ct. 305, 308 (2015) (per curiam)). While the plaintiff need not show "'a case

directly on point'" to prove that "a right [is] clearly established, 'existing precedent must have

placed the statutory or constitutional question beyond debate.' In other words, immunity

protects 'all but the plainly incompetent or those who knowingly violate the law.'" White v.

Pauly, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting Mullenix, 136 S. Ct. at 308).

It is clear that "[t]he Equal Protection right" against discriminatory denial of state

services "was clearly established" long before the conduct at issue in this lawsuit. Brown-

---

[10] Thus, the qualified immunity analysis consists of "two [separate] questions: (1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." Johnson v. Perry, 859 F.3d 156, 170 (2d Cir. 2017) (quoting Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010)). Courts may "exercise [their] sound discretion in deciding which of the two prongs . . . should be addressed first." Id. (quoting Tracy, 623 F.3d at 96); see also Pearson v. Callahan, 555 U.S. 223, 236 (2009).

Alleyne v. White, No. 96-CV-2507 (EHN), 1999 WL 1186809, at *5 (E.D.N.Y. Oct. 11, 1999) (citing DeShaney, 489 U.S. at 197 n.3). "[N]o reasonable government official could believe it lawful . . . to withhold police protection on the basis of race."[11] Id. "Indeed, the 'selective withdrawal of police protection, as when the Southern states during the Reconstruction era refused to give police protection to their black citizens, is the prototypical denial of equal protection.'" Carmichael v. City of N.Y., 34 F. Supp. 3d 252, 261 (E.D.N.Y. 2014) (quoting Hilton v. City of Wheeling, 209 F.3d 1005, 1007 (7th Cir. 2000)). The state-created danger doctrine, too, was clearly established by the time of all conduct relevant here with regard to both affirmative and passive conduct by state officials. See Okin, 577 F.3d at 427-29.

In general, courts considering qualified immunity "use an objective standard for judging the actions of state and federal officials," meaning that courts "do not consider [their] subjective intent, motives, or beliefs." Abrams v. Dep't of Pub. Safety, 764 F.3d 244, 255 (2d Cir. 2014) (internal quotation marks and citations omitted). With Equal Protection claims, however, the defendant officer's subjective intent is an element of the plaintiff's prima facie case of discrimination. Reynolds, 685 F.3d at 201 (requiring "proof of racially discriminatory intent"). The Second Circuit has articulated a blended approach for assessing motions for summary judgment in such circumstances, which this court modifies for the procedural posture of a motion to dismiss: when a defendant asserts "a qualified immunity defense in an action in which an official's conduct is objectively reasonable but an unconstitutional subjective intent is alleged,

---

[11] For the purpose of qualified immunity, it is immaterial that district courts have disagreed on whether a plaintiff must plead similarly situated comparators in order to establish a prima facie case, as described above. See, e.g., City of N.Y., 717 F.3d at 92-93 ("If a public official intentionally acts to the detriment of current or prospective public employees on the basis of race, the official is not shielded by qualified immunity simply because the official might have been unaware that at trial a burden-shifting scheme would regulate the conduct of ensuing litigation.") "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 93 (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)).

the plaintiff must proffer particularized [allegations] of direct or circumstantial facts . . .
supporting the claim of an improper motive in order to avoid [dismissal]." Blue, 72 F.3d
at 1084. That "particularized evidence of improper motive may include expressions by the
officials involved regarding their state of mind, circumstances suggesting in a substantial fashion
that the plaintiff has been singled out, or the highly unusual nature of the actions taken." Id.
Thus, qualified immunity will not protect an officer against a claim of race discrimination in
determining whether a crime ought to be investigated or prosecuted, as long as the allegations of
improper motive are pled with sufficient particularity.

    2. Analysis

    The foregoing discussion yields the following general principles. A plaintiff who has
been denied state protective services can potentially assert Section 1983 claims under both the
Equal Protection Clause and the Due Process Clause. Those claims require very different types
of allegations, however. A successful Equal Protection claim must show that the defendant
intentionally discriminated against the plaintiff based on the plaintiff's membership in a
protected class. A "state-created danger" Due Process claim must show that the defendant
created or enhanced the danger for the plaintiff based on the defendant's assurances to a third
party. The Amended Complaint contains allegations that gesture toward both of these standards,
but the court finds that Plaintiff has failed to satisfy either. Plaintiff's Section 1983 Fourteenth
Amendment claims must therefore be dismissed against both the Officer Defendants and the
City.

    *a. The Equal Protection Claim Against the Officer Defendants*

    Plaintiff asserts that he received "unequal treatment" from the Officer Defendants based
on his status "as a gay Black gentile, as opposed to the more favorable treatment they would
have accorded similarly situated crime victims who were straight, Caucasian and Jewish."

(Am. Compl. ¶ 76.) The court will assume, without deciding, that the circumstances surrounding the initial closure of Plaintiff's case were "highly unusual," Blue, 72 F.3d at 1084, given the severity of Plaintiff's injuries, the quality of the information allegedly available from eyewitnesses, and the speed with which the matter was closed out. Even so, a police officer's decision not to pursue a strong lead will not, standing alone, establish an Equal Protection violation. See Lopez v. City of N.Y., 186 F. Supp. 3d 304, 312-13 (S.D.N.Y. 2016) ("[I]n police failure-to-serve cases, the courts consistently have required more evidence of discriminatory intent than a simple failure of diligence, perception, or persistence in a single case involving minority victims." (quoting Carmichael, 34 F. Supp. 3d at 262)). The court will therefore consider Plaintiff's other allegations for evidence of discriminatory intent based on Plaintiff's membership in a protected class.

As a preliminary matter, the court finds no allegations that suggest intentional discrimination by any Officer Defendant—or any other City official—on the basis of Plaintiff's Black race or gay sexual orientation. Thus, the court focuses on Plaintiff's argument that he was denied police services based on the fact that he is not Jewish. See Sherman v. Town of Chester, 752 F.3d 554, 567 (2d Cir. 2014) ("Jews are considered a race for the purposes of" civil rights claims. (citing United States v. Nelson, 277 F.3d 164, 177 (2d Cir. 2002)).

The Amended Complaint is replete with generalized allegations that Jews receive special treatment from the 90th Precinct and the NYPD, but these allegations all focus on criminal suspects rather than victims.[12] (See, e.g., Am. Compl. ¶¶ 52 (quoting a retired police captain as saying in 2003 that "it almost seemed like there were two penal codes, one for the Hasidic

---

[12] Such allegations might be actionable, for example, in a "selective prosecution" Equal Protection claim brought by a non-Jewish criminal suspect, but do not appear directly relevant to an Equal Protection claim brought by a non-Jewish victim.

community and one for everyone else"); 53 (describing "fixers" within the NYPD who "assist in avoiding and voiding arrests of Jewish crime suspects").) Plaintiff's only comment on Jewish victims alleges that a "full-time 'liaison' to the Hasidic community" was posted in the Kings County District Attorney's office—not the NYPD—and that this liaison "had to be kept in the loop in virtually every case involving either orthodox Jewish victims or defendants, and [] was very influential in the disposition of such matters." (Id. ¶ 54.) This allegation is insufficient to establish an inference that any of the Officer Defendants closed out Plaintiff's case specifically because he was not Jewish. Compare, e.g., Bush v. City of Utica, No. 6:12-CV-1444, 2016 WL 3072384, at *7 (N.D.N.Y. May 31, 2016) ("[A] fact finder could [] conclude that [Fire] Chief Brooks's statement that he would not 'risk the lives or equipment of any fire fighters for anybody on James Street' actually reflected [the fire department's] alleged . . . policy of providing only diminished protective services to the City's low-income neighborhoods.").

The court finds that Plaintiff has failed to sufficiently allege that any Officer Defendant intended to discriminate against Plaintiff by deciding to close his case with no arrests. As a result, Plaintiff has failed to establish an Equal Protection violation against the Officer Defendants.

### b. The Equal Protection Claim Against the City

Plaintiff's Equal Protection claim against the City fails for the same reasons outlined above. Plaintiff has failed to sufficiently allege differential treatment of Jewish vesus non-Jewish crime victims, and he has not offered any specific allegations at all in support of his claim that any municipal official discriminated against him based on his Black race or gay sexual orientation.

### c. The Substantive Due Process Claim Against the Officer Defendants

Plaintiff fares no better under the Due Process "state-created danger" doctrine. Though Plaintiff alleges that, in general, the orthodox Jewish community receives "[f]avoritism and preferential treatment" (Am. Compl. ¶ 52), Plaintiff has failed to offer allegations specific to any individual Officer Defendant. "[T]he key question is whether [any] individual defendants told, or otherwise communicated to," Plaintiff's assailants that they could accost and assault Plaintiff "without fear of punishment." Pena, 432 F.3d at 111. The Amended Complaint offers no basis for concluding that, prior to Plaintiff's assault, any Officer Defendant "created or enhanced the danger of private violence" against Plaintiff. Okin, 577 F.3d at 428 (citing Dwares, 985 F.2d at 99).

### d. The Substantive Due Process Claim Against the City

Plaintiff's Due Process claim against the City similarly fails due to a dearth of specifics. "[T]here are several different ways of establishing municipal liability under Section 1983," Green v. City of N.Y., 465 F.3d 65, 80 (2d Cir. 2006), including by alleging (1) the existence of a formal policy, (2) actions taken by officials with policymaking authority, (3) a failure to properly train or supervise municipal employees, or (4) a practice so persistent and widespread that it constitutes a "custom or usage," Moray v. City of Yonkers, 924 F. Supp. 8, 12 (S.D.N.Y. 1996) (collecting authority). The Amended Complaint uses language that tracks all four theories of municipal liability for this claim. (Am. Compl. ¶¶ 64-66,[13] 70-71.) Plaintiff has failed to substantiate any of those theories, however, and so the claim must be dismissed.

---

[13] Some of these paragraphs appear under the heading of Plaintiff's Fourth Amendment cause of action against the City, but the allegations contained therein could be read as supporting a "state-created danger" theory of municipal liability.

The court dispenses summarily with the first three theories described above. First, Plaintiff has not described any explicit NYPD policies affording favorable treatment to criminal suspects who are Jewish. Second, while the Amended Complaint does discuss actions taken by policymakers, those decisions all relate to decisions to fund the WSP Groups' activities; such actions cannot reasonably be construed as an assurance that future criminal activity would go unpunished. Third, Plaintiff accuses the City of failing to train the WSP Groups—a claim that might be actionable if the WSP Groups were found to be state actors—but nowhere discusses any specific failure to train or supervise municipal officials.

The final theory merits additional discussion. Plaintiff may establish municipal liability by showing that the alleged unconstitutional practice was "so persistent or widespread as to constitute a custom or usage with the force of law." Littlejohn, 795 F.3d at 315 (quoting Patterson v. Cty. of Oneida, 375 F.3d 206, 226 (2d Cir. 2004)). Plaintiff offers grave allegations to this effect, most notably that "[t]he NYPD has regularly taken custody of individuals initially apprehended by the Shomrim, who have significant injuries, and yet has failed to inquire into the source of the injuries, which often resulted from excessive force by the Shomrim members." (Am. Compl. ¶ 64.) Further, as noted above, "Orthodox Jewish communities" allegedly have "'fixers' and '[liaisons]' to the NYPD," who "assist in avoiding and voiding arrests of Jewish crime suspects." (Id. ¶ 53.) If true, these allegations raise serious concerns. Plaintiff has failed to substantiate those allegations, however, or to connect them to the particular misconduct alleged in this case.

"The broader the policy a plaintiff seeks to plead, the greater the factual allegations that are required to render it plausible." White, 206 F. Supp. 3d at 937 n.2. As District Judge Brian M. Cogan wrote in a recent opinion:

> It is one thing to assert, for example, that a municipality is training its officers to use a particular choke-hold that carries a high risk of asphyxiation not used by other municipalities . . . . It is quite another matter to allege broadly that as a general practice, a municipality fails to give "adequate" remedial training for officers' violations of the full panoply of constitutional rights, for which the appropriate remedial action might vary infinitely with the distinct facts of any police encounter.

Rasmussen v. City of N.Y., 766 F. Supp. 2d 399, 408 (E.D.N.Y. 2011). The allegations in this case more closely resemble the latter scenario: Plaintiff lodges generalized accusations of widespread preferential treatment of Jewish criminal suspects, apparently as against all other groups and across all types of criminal conduct, but in a form that varies from case to case. (See Am. Compl. ¶ 53 (alleging that "fixers" assist by, for example, "avoiding and voiding arrests," "undercharging Jewish crime suspects, . . . issuing discretionary 'desk appearance tickets' to Jewish crime suspects, and intervening with the Kings County District Attorney's office").)

A plaintiff may not avoid dismissal merely by "tender[ing] 'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)). Absent specific examples or some other form of supporting evidence, Plaintiff's generalized allegations of widespread misconduct are insufficient to sustain his Due Process Monell claim. See, e.g., White, 206 F. Supp. 3d at 938 (assessing a complaint that alleged "[h]alf a dozen dissimilar incidents spread over the past five years" and finding those examples insufficient "to render [plausible] the generalized, conclusory allegations of the existence of a policy of abuse towards transgender persons"); Walker v. City of N.Y., No. 14-CV-808 (ER), 2015 WL 4254026, at *7 (S.D.N.Y. July 14, 2015) (declining to impose Monell

liability based on generalized allegations "that the NYPD has subjected 'innocent citizens' to excessive force during other arrests and that it has established a practice to conceal its abuse of authority").

Even if Plaintiff had adequately alleged the existence of a widespread policy of favoritism for Jewish criminal suspects, Plaintiff would bear the additional burden of explaining how that policy "affirmatively created or enhanced the danger of private violence" in this specific case. Okin, 577 F.3d at 428. Plaintiff has not alleged that any WSP Individual Defendant was aware of the alleged preferential treatment for Jewish suspects, or argued that they acted more violently as a result. Nor has Plaintiff alleged that a "fixer" was involved in the Officer Defendants' decision to close out Plaintiff's case without making arrests.

In sum, though the Amended Complaint paints a troubling picture, that picture does not contain the key details necessary to assert a claim for municipal liability under the "state-created danger" theory.

*   *   *

Plaintiff's allegations are insufficient to establish that any Officer Defendant violated the Equal Protection Clause by intentionally discriminating against Plaintiff, or that any Officer Defendant violated the Due Process Clause by providing assurances to Plaintiff's assailants that their behavior would go unpunished. Plaintiff has also failed to plausibly allege a basis for imposing liability on the City under either theory. Accordingly, the court dismisses Plaintiff's Section 1983 Fourteenth Amendment claims against all Municipal Defendants.

# V. SECTION 1985 CONSPIRACY CLAIMS

## A. Legal Standard

Section 1985(3) prohibits individuals from conspiring to violate a person's civil rights.

> A conspiracy claim under Section 1985(3) requires a plaintiff to allege: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person . . . of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States."

Dolan v. Connolly, 794 F.3d 290, 296 (2d Cir. 2015) (quoting Britt v. Garcia, 457 F.3d 264, 269 n.4 (2d Cir. 2006)).

To successfully allege a conspiracy, "a plaintiff 'must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.'" Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003) (quoting Romer v. Morgenthau, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000)). "The conspiracy must also be 'motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus.'" Dolan, 794 F.3d at 296 (quoting Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 791 (2d Cir. 2007) (internal quotation marks omitted)). Unlike claims under Section 1983, claims under Section 1985 may target conduct by private parties.

## B. The Section 1985 Claim Based on the Assault

Plaintiff asserts that the WSP Individual Defendants "conspired among themselves between approximately 3:00 AM on December 1, 2013, and 5:00 AM on December 1, 2013, for the purpose of depriving Plaintiff" of "equal privileges and immunities under the law, including the privilege of using the public streets." (Am. Compl. ¶ 79.) The Amended Complaint contains no indication that Plaintiff was targeted or assaulted based on the fact that he was Black or non-Jewish. Plaintiff does allege, however, that after the full contingent of WSP members had

29

arrived, pursued him, and caught him, certain WSP Individual Defendants "were using

homophobic slurs" as they were assaulting him.[14] (Id. ¶ 33.)

Prejudiced remarks can form the basis for a Section 1985(3) claim insofar as they evince

discriminatory intent; those remarks must be coupled, however, with sufficient evidence "that

defendants entered into an agreement" to achieve an unlawful end. Webb, 340 F.3d at 110. In

Walker v. Shepard, 107 F. Supp. 2d 183 (N.D.N.Y. 2000), for example, the court found plausible

evidence that a group of White assailants acted with racial animus where, on the night of the

assault, they accosted two separate groups of Black individuals, displaying physically

threatening behavior, making verbal threats of violence, and using hostile racial slurs.

107 F. Supp. 2d at 189-90.

Here, by contrast, Plaintiff alleges that he was identified by two individuals who

"believed [he] was acting suspiciously," and who called the WSP Groups "to report [that]

suspicious behavior." (Am. Compl. ¶¶ 26-27.) Thus, the pursuit and assault appear to have been

motivated by suspicions of wrongdoing, with no evidence of ex ante prejudice, homophobic or

otherwise. The fact that certain unspecified individuals may have used homophobic slurs during

the assault does not permit the inference that any of the WSP Individual Defendants had entered

into a conspiracy to attack Plaintiff because of his sexuality. Accordingly, this claim is

dismissed against Defendants Braver and Herskovic.

## C. The Section 1985 Claim Based on the Investigation

Plaintiff asserts that the Officer Defendants and the WSP Individual Defendants

conspired among themselves "for the purpose of impeding, hindering, obstructing, or defeating

---

[14] The court assumes without deciding that homophobia can qualify as "invidious discriminatory animus" for the purpose of Section 1985(3) claims. Dolan, 794 F.3d at 296 (citation omitted); see Windsor v. United States, 699 F.3d 169, 181 (2d Cir. 2012), aff'd, 133 S. Ct. 2675 (2013) (finding that "homosexuals" constitute a "quasi-suspect class" entitled to "heightened scrutiny").

the due course of justice, with intent to deny Plaintiff the equal protection of the laws." (Am. Compl. ¶ 83.)

As discussed above in Section IV.D.2, however, Plaintiff has not sufficiently alleged any connection between the Officer Defendants' decision to close out Plaintiff's case and Plaintiff's status as a Black person, a gay person, or a non-Jewish person. Based on Plaintiff's own allegations, the ostensible impetus appears to be linked to the identity of the <u>assailants</u> rather than the identity of the <u>victim</u>. The inadequate basis for finding discriminatory intent proved fatal to Plaintiff's Equal Protection claim under Section 1983, and it proves equally fatal to Plaintiff's Section 1985(3) conspiracy claim. <u>Dolan</u>, 794 F.3d at 296 (explaining that Section 1985(3) claims require a showing of "invidious discriminatory animus" as part of a conspiracy to violate Equal Protection rights). Moreover, there is no allegation that any WSP Individual Defendant played a role in the Officer Defendants' actions that night; for example, Plaintiff does not specifically allege that any WSP Individual Defendant made "[c]alls to the precinct" on the night of the assault. (Am. Compl. ¶ 37.)

Accordingly, this claim must be dismissed against the Officer Defendants and WSP Individual Defendants Braver and Herskovic.

## VI. CONCLUSION

For the reasons set forth above, the Municipal Defendants' motion to dismiss (Dkt. 50) is GRANTED; Defendant Braver's motion for judgment on the pleadings (Dkt. 52) is GRANTED; and Defendant Herskovic's motion to dismiss (Dkt. 63) is GRANTED. All claims against the moving defendants are DISMISSED WITH PREJUDICE.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      August 8 , 2017

NICHOLAS G. GARAUFIS
United States District Judge